UNITED STATES FIDELITY INSURANCE & GUARANTY COMPANY
v MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION
HARTFORD INSURANCE COMPANY OF THE MIDWEST
v MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION

Docket Nos. 260604, 271199. Submitted December 6, 2006, at Detroit. Decided February 6, 2007, at 9:00 a.m. Leave to appeal sought.

United States Fidelity Insurance & Guaranty Company (USF&G) and Hartford Insurance Company of the Midwest (Hartford) filed separate actions in the Oakland Circuit Court seeking declaratory judgments that, under MCL 500.3104, the Michigan Catastrophic Claims Association (MCCA) was required to reimburse them for personal protection insurance payments made to insureds who suffered catastrophic injuries, regardless of whether the charges were reasonable. In Docket No. 260604, the trial court, Steven N. Andrews, J., concluded that the MCCA was required to indemnify USF&G for the actual amount it had paid above the statutory threshold regardless of whether the charges were reasonable, and granted summary disposition to USF&G. The MCCA appealed. In Docket No. 271199, the trial court, Rudy J. Nichols, J., denied Hartford's motion for summary disposition after concluding that the MCCA could challenge the reasonableness of the charges as a defense to a claim for indemnification, and Hartford appealed. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

MCL 500.3104 unambiguously requires the MCCA to reimburse insurers for the full amount of personal protection insurance benefits exceeding the statutory threshold that the insurer was obligated to pay to its insured, regardless of the circumstances under which that amount was determined or whether the amount was reasonable. The argument that this interpretation will increase the costs of insurance and health care is unavailing because it is not the Court's role to inquire into the wisdom of unambiguous legislation and such an inquiry would reveal that the interpretation the MCCA suggests would increase the risk of insolvency for insurers by forcing individual insurers to absorb the losses resulting from payments that the MCCA considers unreasonable rather than allowing the losses to be spread among all the MCCA

members. Because the statute is unambiguous, the "absurd result" rule is not applicable, and no deference is due to the Office of Financial and Insurance Service's interpretation because it contravenes the statute's plain language.

*USF&G* affirmed; *Hartford* reversed and remanded for further proceedings.

WHITE, J., concurring, noted that there was no indication that either insurance company acted in bad faith in paying the amounts they did to their insureds, nor was there any indication that either insurer applies a double standard in adjusting those claims that the MCCA must reimburse. The statutory framework provides that the determination of reasonableness is to be made by the insurer or through litigation, and the resulting amount is that which the insurers are obligated to pay and the MCCA is obligated to indemnify. The statute does not contemplate a role for the MCCA as a party to the insurance contract or to litigation, or as a de facto regulatory body that determines what amounts are reasonable for which services.

INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE — CATASTROPHIC CLAIMS — INDEMNIFICATION.

The Michigan Catastrophic Claims Association is required by statute to reimburse an insurer for the full amount of personal protection insurance benefits exceeding the statutory threshold that the insurer was obligated to pay to its insured, regardless of the circumstances under which that amount was determined or whether the amount was reasonable (MCL 500.3104).

*Plunkett & Cooney, P.C.* (by *Jeffrey C. Gerish* and *Gregory Gromek*), for United States Fidelity Insurance & Guaranty Company.

*Stark Reagan, P.C.* (by *Ava K. Ortner*) and *Dykema Gossett PLLC* (by *Joseph K. Erhardt, Jill M. Wheaton,* and *K. J. Miller*), for the Michigan Catastrophic Claims Association.

*Secrest Wardle* (by *Janet Callahan Barnes* and *John H. Cowley, Jr.*) for The Hartford Insurance Company of the Midwest.

Amici Curiae:

*Secrest Wardle* (by *Janet Callahan Barnes* and *John H. Cowley, Jr.*) for The Hartford Insurance Company of the Midwest in Docket No. 260604.

*John A. Lydick* for the Insurance Institute of Michigan.

*Gross, Nemeth & Silverman, P.L.C.* (by *Mary T. Nemeth*) for Auto Club Insurance Association.

Before: OWENS, P.J., and WHITE and HOEKSTRA, JJ.

PER CURIAM. These consolidated appeals concern the extent of the Michigan Catastrophic Claims Association's (MCCA) duty to indemnify its member insurance companies for losses incurred as a result of personal protection insurance (PIP) payments made to insureds who have suffered catastrophic injuries.

In Docket No. 260604, the MCCA appeals by right the Oakland Circuit Court's November 3, 2004, order granting summary disposition to plaintiff United States Fidelity Insurance & Guaranty Company (USF&G) under MCR 2.116(C)(10). The court interpreted MCL 500.3104 as requiring the MCCA to indemnify its members for the actual amount that each member paid in PIP coverage in excess of the $250,000 statutory threshold, rejecting the MCCA's argument that it is only required to indemnify its members for "reasonable" charges. We affirm.

In Docket No. 271199, plaintiff The Hartford Insurance Company of the Midwest (Hartford) appeals by leave granted the Oakland Circuit Court's June 6, 2006, order denying its motion for summary disposition under MCR 2.116(C)(9) and (C)(10). The court determined that the MCCA may challenge the reasonableness of a

member's payments for PIP benefits as a defense to a claim for indemnification under MCL 500.3104. We reverse.

## I. FACTS AND PROCEDURAL HISTORY

### A. DOCKET NO. 260604

On August 22, 1981, Daniel Migdal, aged 17, was involved in an automobile accident that left him severely and permanently injured. Since then, Daniel has required constant nursing care. In 1988, Michael Migdal, Daniel's father and the conservator of his estate, sued USF&G to recover attendant care benefits for the care that he and his wife, Betty, provided to Daniel.[1]

In early 1990, the parties stipulated the entry of a consent judgment under which USF&G agreed to pay Michael a lump sum of $35,000 for attendant care services rendered before May 10, 1989. USF&G also agreed to pay, beginning January 25, 1989, $17.50 "per hour for nursing care services," for "a single nurse," for a maximum of 24 hours a day, with yearly increases of 8.5 percent, compounded annually, "during the period Daniel Migdal is residing in the family home." The judgment also provided that if the Migdals became unable or unwilling to continue providing Daniel's home care, USF&G would reimburse Michael for the costs of Daniel's care at the rate charged by the facility providing care. All personnel decisions, including hiring, firing, scheduling, and staffing, as well as all placement decisions, were at the Migdals' sole discretion.

USF&G maintained that its stipulation for the entry of the consent judgment was the product of its best

---

[1] Betty Migdal died in 1993.

judgment, appeared reasonable, and represented a compromise of various disputed factors, including Michael's claim that more than one nurse was needed to care for Daniel and the then-high inflation rate for medical care.[2] Regardless, according to USF&G, by July 2003 it had paid over $7 million in PIP benefits on Daniel's behalf. In 2003, USF&G paid $54.84 an hour for Daniel's nursing care services.[3]

Michael created a company (Migdal, doing business as Medical Management) to manage Daniel's care. He hired and paid nurses to care for Daniel through the company. In 2003, the nurses were paid, on average, $32 an hour, including benefits, and Michael kept as his compensation the approximately $200,000 difference between the costs of nursing care and the money paid by USF&G. To manage the company and Daniel's care, Michael would spend time with Daniel, nurses, and therapists; check equipment; prepare the payroll; talk to his accountant; review newspapers and magazines; interview, hire, and manage the company's nurses; and help move Daniel as needed.

After the consent judgment was entered, USF&G paid the rate stipulated therein, without continuing to review its reasonableness. USF&G submitted these claims to the MCCA for reimbursement. The MCCA reimbursed USF&G $22.05 an hour for nursing care services, which it considered a reasonable rate of reimbursement, not the hourly rate stipulated in the consent judgment.

---

[2] Moreover, Michael testified in his deposition that $17.50 an hour was below the going hourly rate for nurses in 1989.

[3] The MCCA estimated that USF&G would pay $59.50 an hour in 2004 and $64.55 an hour in 2005 for Daniel's nursing care. Michael noted that, on the basis of his experience with various nursing companies, he believed that $59.50 was a reasonable hourly rate to pay a company providing registered nurses and licensed practical nurses in 2004.

On July 29, 2003, USF&G filed a complaint for a declaratory judgment, asking the court to declare that the MCCA was required to reimburse it for *all* amounts it paid under the consent judgment, without regard to the MCCA's assessment of the "reasonableness" of these payments.[4] The MCCA moved for summary disposition of this claim under MCR 2.116(C)(10), arguing that the no-fault act only required it to indemnify its members for reasonable claims paid above the statutory threshold and that there was no question of material fact that the benefits paid by USF&G were unreasonable. USF&G filed a countermotion for summary disposition under MCR 2.116(C)(9) and (C)(10), arguing that a question of material fact existed concerning the reasonableness of the payments made to Michael and that, in any event, the no-fault act required the MCCA to reimburse it for the full amount of its "ultimate losses" over the statutory threshold.[5]

On November 3, 2004, the trial court granted USF&G's MCR 2.116(C)(10) motion for summary disposition and denied the MCCA's motion. The trial court found that nothing in the no-fault act prevented an insurer from entering a long-term settlement agreement to provide nursing care services to an insured person who was catastrophically injured in a motor vehicle accident. The court found that, because the statute requires the MCCA to reimburse USF&G for

---

[4] USF&G also claimed that, because Michael no longer provided home care services to Daniel himself, the court should reform USF&G's consent judgment with Michael to provide for the payment of a reasonable rate to the individuals hired to care for Daniel. Michael moved for summary disposition of this claim. On June 18, 2004, the trial court granted the motion, apparently finding that the consent judgment could not be revised or reformed. USF&G has not appealed that decision. Michael Migdal is not a party to this appeal.

[5] Because both parties relied on matters outside the pleadings, the trial court declined to consider the motion under MCR 2.116(C)(9).

the total amount of its "ultimate loss," the real issue was whether the MCCA must reimburse USF&G for all its payments or merely for reasonable payments. After examining the language of the statute, the trial court found that "ultimate loss" was defined as an insurer's "actual loss," and that nothing in the statute required that amount to be reasonable. The court declined to inject any requirements in the statute that were not included by the Legislature and found no merit to the MCCA's argument that the payments provided by the consent judgment were unreasonable.

On January 12, 2005, a judgment was entered awarding USF&G $1,725,072 in reimbursement for PIP benefits paid to Michael through December 31, 2004. The parties preserved the MCCA's right to appeal and agreed to stay enforcement of the trial court's decision. This appeal followed.

### B. DOCKET NO. 271199

On November 6, 2001, Robert Allen was involved in an automobile accident that left him severely and permanently injured. Allen's treating physicians prescribed constant attendant care by a licensed practical nurse. Allen's daughter apparently provides this care. Hartford initially paid Allen $20 an hour for attendant care. In June 2003, Allen retained an attorney and demanded that Hartford pay $37 an hour for attendant care. Allen and Hartford apparently reached a settlement in which Hartford agreed to pay $30 an hour for attendant care beginning May 6, 2003, with no rate increases until May 6, 2006.

The MCCA refused to reimburse Hartford for attendant care services paid at any amount above $20 an hour, questioning the reasonableness of the hourly rate, the qualifications of the service providers, and whether

Allen still needed these services. By February 26, 2006, Hartford had paid $1,449,326.03 on Allen's behalf. Hartford claimed that the MCCA had reimbursed it for $627,478.82 in PIP benefits that it paid to Allen, but refused to reimburse it for an additional $571,847.21 in PIP payments.

On January 24, 2006, Hartford filed a complaint for declaratory judgment, alleging that under the no-fault act, the MCCA had a duty to reimburse Hartford for its net losses above the $250,000 statutory threshold. Hartford also sought a declaration that the MCCA had a duty to reimburse it for attendant care services paid at the rate of $30 an hour through May 6, 2006, as well as a declaration of any other matters necessary to provide complete relief.

Hartford then moved for summary disposition under MCR 2.116(C)(9) and (C)(10), arguing that the no-fault act required the MCCA to reimburse it for its actual losses above the statutory threshold without making an independent inquiry concerning the reasonableness of the payments. The MCCA argued that the no-fault act only required it to indemnify Hartford for reasonable claims paid above the statutory threshold. The MCCA also argued that Hartford's motion was premature because no discovery had been conducted concerning the reasonableness of the benefits paid to Allen.

The trial court concluded that the MCCA's defense —that Hartford was paying unreasonable claims—was not untenable as a matter of law and, therefore, summary disposition was not warranted under MCR 2.116(C)(9). The court also determined that the statute incorporated an element of reasonableness in the payment of PIP benefits. After distinguishing the Oakland Circuit Court's ruling in Docket No. 260604 because it involved a consent judgment, the trial court noted:

Concerning the plain language of the statutes, the Court cannot conclude summary disposition in plaintiff's favor would be proper particularly in light of defendant's inquiry into payment of attendant care services to the Allen family members and information from a home care attendant regarding a potential lack of necessary care for Allen.

The court concluded that a question of material fact existed concerning the reasonableness of the PIP benefits paid by Hartford and denied the motion. On August 16, 2006, this Court granted Hartford's application for leave to appeal, consolidated this appeal with Docket No. 260604, and stayed the proceedings below.

## II. MCCA DUTY TO REIMBURSE UNDER THE NO-FAULT ACT

Although the appellants in Docket No. 260604 and Docket No. 271199 dispute the propriety of contradictory rulings by the Oakland Circuit Court, the parties present the same central question for our consideration. Specifically, USF&G and Hartford argue that MCL 500.3104 requires the MCCA to reimburse insurers for the actual amounts they paid for PIP benefits above the statutory threshold. The MCCA argues that MCL 500.3104 only requires it to reimburse insurers for the *reasonable* costs of PIP benefits paid by insurers in excess of the statutory threshold. We hold that MCL 500.3104 does not incorporate a "reasonableness" requirement and requires the MCCA to reimburse insurers for the *actual* amount of PIP benefits paid in excess of the statutory threshold. In other words, the MCCA is statutorily required to reimburse an insurer for 100 percent of the amount that the insurer paid in PIP benefits to an insured in excess of the statutory threshold listed in MCL 500.3104(2), regardless of the reasonableness of these payments.

We review de novo a trial court's decision concerning a motion for summary disposition. *Maiden v Rozwood,* 461 Mich 109, 118; 597 NW2d 817 (1999). We also review questions of statutory interpretation or construction de novo. *Michigan Muni Liability & Prop Pool v Muskegon Co Bd of Co Rd Comm'rs,* 235 Mich App 183, 189; 597 NW2d 187 (1999); *Haworth, Inc v Wickes Mfg Co,* 210 Mich App 222, 227; 532 NW2d 903 (1995).

When construing the provisions of a statute, our primary task is to discern and give effect to the intent of the Legislature. *Sun Valley Foods Co v Ward,* 460 Mich 230, 236; 596 NW2d 119 (1999).

> This task begins by examining the language of the statute itself. The words of a statute provide "the most reliable evidence of its intent . . . ." *United States v Turkette,* 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. *Tryc v Michigan Veterans' Facility,* 451 Mich 129, 135; 545 NW2d 642 (1996). Only where the statutory language is ambiguous may a court properly go beyond the words of the statute to ascertain legislative intent. *Luttrell v Dep't of Corrections,* 421 Mich 93; 365 NW2d 74 (1984). [*Id.*]

"[A] provision of the law is ambiguous only if it 'irreconcilably conflict[s]' with another provision or when it is *equally* susceptible to more than a single meaning." *Mayor of Lansing v Pub Service Comm,* 470 Mich 154, 166; 680 NW2d 840 (2004) (citation omitted; emphasis in the original). "We may not read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Lesner v Liquid Disposal, Inc,* 466 Mich 95, 101; 643 NW2d 553 (2002). Also, we "must not judicially legislate by adding into a statute provisions

that the Legislature did not include." *In re Wayne Co Prosecutor*, 232 Mich App 482, 486; 591 NW2d 359 (1998). "The fact that another statutory scheme might appear to have been wiser or would produce fairer results is irrelevant." *Smith v Cliffs on the Bay Condo Ass'n*, 463 Mich 420, 430; 617 NW2d 536 (2000).

Pursuant to MCL 500.3105(1), "[u]nder personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle . . . subject to the provisions of this chapter." MCL 500.3107 identifies PIP benefits that are payable as a result of an automobile accident. The statute states in part:

> (1) [P]ersonal protection insurance benefits are payable for the following:
>
> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation.

Accordingly, an insurer is required to reimburse an insured for reasonable charges for reasonably necessary products, services, and accommodations that address the care, recovery, and rehabilitation of an insured injured in an automobile accident. Stated differently, "an insurer is not *liable* for any medical expense to the extent that it is not a reasonable charge for a particular product or service, or if the product or service itself is not reasonably necessary." *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 49; 457 NW2d 637 (1990) (emphasis in the original). MCL 500.3107(1)(a) inserts a reasonableness requirement in the insurer's obligation to pay PIP benefits to an insured—the insurer is required to pay PIP benefits to the insured pursuant to MCL 500.3105(1), but MCL 500.3107 indicates that this requirement only obligates the insurer to reimburse the

insured for reasonable charges for reasonably necessary products, services, and accommodations.

At times, an automobile accident might leave an insured severely and permanently disabled, requiring a lifetime of care. The MCCA was created "in response to concerns that Michigan's no-fault law provision for unlimited personal injury protection benefits placed too great a burden on insurers, particularly small insurers, in the event of 'catastrophic' injury claims." *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, 433 Mich 710, 714; 449 NW2d 660 (1989).[6]

The MCCA is a statutorily created, nonprofit organization comprised of all insurers writing automobile insurance in the state of Michigan. MCL 500.3104(1). An insurer must belong to the MCCA in order to write

---

[6] Our Supreme Court explained the rationale for creating the MCCA as follows:

> The Legislature recognized that while such claims might be rare, they are also unpredictable, and equally as likely to strike a small or medium-sized insurer as they are a large insurer. The obvious problem is that the small or medium-sized companies have substantially fewer cars over which to spread the costs of potential losses, which means that the costs of providing unlimited medical and other benefits is higher per car for such companies, putting them at a competitive disadvantage in the state's insurance market. In addition to this competitive disadvantage, the Legislature considered the practical "business difficulties" confronting all insurers as a result of such possible catastrophic claims, such as the difficulty in determining the amount of reserves to keep on hand.

> It was thought that the creation of such an association of insurers would alleviate the competitive inequity of these catastrophic claims by spreading their cost throughout the industry, and also increase the statistical basis for prediction of the overall cost of such claims, making the management of these liabilities easier. See House Legislative Analysis, SB 306, March 13, 1978. [*Preferred Risk, supra* at 714 n 2.]

insurance in this state. *Preferred Risk, supra* at 715. "In practice, the [MCCA] acts as a kind of 'reinsurer' for its member insurers." *Id.* MCL 500.3104(2) states:

> (2) The association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence:
>
> (a) For a motor vehicle accident policy issued or renewed before July 1, 2002, $250,000.00.[7]

Accordingly, insurers belonging to the MCCA are entitled to indemnification for PIP payments incurred in excess of the statutory threshold. Specifically, they are entitled to "indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages . . . ." MCL 500.3104(25)(c) defines "ultimate loss" as "the actual loss amounts that a member is obligated to pay and that are paid or payable by the member, and do not include claim expenses. An ultimate loss is incurred by the association on the date that the loss occurs." Inserting this definition of "ultimate loss" in the portion of MCL 500.3104(2) mandating reimbursement, the statute requires that "[t]he association shall provide . . . indemnification for 100% of the . . . [actual loss amounts that a member is obligated to pay and that are paid or payable by the member] sustained under personal protection insurance coverages . . . ." Specifically, the MCCA is required to reimburse an insurer for the full amount of "the actual loss amounts that [the insurer] is obligated to pay . . ." in excess of the statutory threshold.

---

[7] Because both policies were issued before July 1, 2002, the $250,000 threshold applies.

Although MCL 500.3105 and MCL 500.3107 indicate that an insurer is only required to reimburse an insured for reasonable charges, MCL 500.3104 does not include a reasonableness requirement. Instead, MCL 500.3104 unambiguously requires the MCCA to reimburse insurers for "actual loss amounts that a member is obligated to pay . . . ." Although MCL 500.3105 and MCL 500.3107 anticipate that PIP benefits paid by an insurer to an insured will be reasonable, nothing in MCL 500.3104 permits the MCCA to review the reasonableness of a settlement, judgment, or agreement between the insurer and the insured. We will not read a "reasonableness requirement" into MCL 500.3104 when the plain language of the statute does not indicate that the Legislature intended that the MCCA review PIP payments for reasonableness. *Lesner, supra* at 101; *Wayne Co Prosecutor, supra* at 486.

Instead, by requiring the MCCA to reimburse an insurer for the amount that the insurer, in turn, is obligated to pay in PIP benefits, MCL 500.3104 requires the MCCA to reimburse the insurer for the full amount (above the statutory threshold) of PIP benefits that the insurer is bound to pay to its insured, regardless of the circumstances under which that amount was determined, whether by agreement, judgment, binding arbitration, or otherwise, or the reasonableness of that amount. The MCCA's reimbursement obligation is reemphasized in MCL 500.3104(7)(a), which provides that "[t]he association shall . . . [a]ssume 100% of all liability as provided in [MCL 500.3104(2)]." Consequently, MCL 500.3104 provides that the MCCA must indemnify an insurer for 100 percent of the actual loss amounts (above the statutory threshold established in MCL 500.3104[2]) that the insurer is obligated to pay in PIP coverages, regardless of the reasonableness of these

payments.[8] The MCCA's argument in Docket Nos. 260604 and 271199 that it is only required to reimburse Hartford and USF&G for PIP coverages that are reasonable and, hence, that it can review for reasonableness these insurers' agreements to pay PIP benefits to their insureds is without merit.

The MCCA and amicus curiae Auto Club Insurance Association argue that the MCCA should not be required to reimburse an insurer for unreasonable pay-

---

[8] The MCCA claims that in *Farmers Ins Exch v South Lyon Community Schools*, 237 Mich App 235; 602 NW2d 588 (1999), this Court held that the MCCA is not bound to reimburse an insurer for amounts that the insurer was not required to pay under the no-fault act. The MCCA quotes the following footnote:

> Pursuant to MCL 500.3104 . . . , every insurer writing no-fault insurance must be a member of the [MCCA]. The MCCA indemnifies its member insurers for losses in excess of $250,000 paid under personal protection insurance coverage in a single loss occurrence. *However, the MCCA is not obligated to indemnify its member insurers for amounts the insurers are not obligated to pay under their no-fault policies. [Id.* at 238 n 1 (emphasis added by the MCCA).]

In *Farmers Ins Exch*, this Court considered whether the defendant school district was responsible for paying for nursing services provided to a special education student during school hours and during transportation to and from school, given that the student's injuries arose from a motor vehicle accident. *Id.* at 238-239. The plaintiff insurance company sought reimbursement from the defendant for money paid to provide these services after the student's accident. *Id.* at 238. The MCCA intervened as a *plaintiff*, and the quoted statement was made in the context of explaining the MCCA's purpose. See *id.* This Court held that, under MCL 500.3109(1), because the defendant was required to provide the disputed medical services to the student pursuant to federal law, the plaintiff was entitled to subtract them from the PIP benefits otherwise payable. *Id.* at 239-248. Except for the footnote quoted above, the Court did not address the MCCA's reimbursement obligations under the no-fault act. Thus, contrary to the MCCA's argument, the statement is dictum and not binding on this Court. *Dessart v Burak*, 252 Mich App 490, 496; 652 NW2d 669 (2002), aff'd 470 Mich 37 (2004). The case is inapposite.

ments incurred by the insurer pursuant to a settlement agreement or a consent judgment. Yet although it may be more appealing to argue that the MCCA should not be liable for unreasonable payments that an insurer has voluntarily incurred pursuant to an agreement, nothing in the language of MCL 500.3104 supports this distinction. Rather, by its plain terms, MCL 500.3104 applies to all actual loss amounts that an insurer is obligated to pay above the statutory threshold, regardless of the source of the obligation. There is no language in MCL 500.3104 that supports distinguishing among a settlement agreement, a judgment, a binding arbitration award, or any other payment that an insurer is legally required to make, even if the amount is, or later becomes, unreasonable.[9] To the contrary, the proposed distinction permitting the MCCA to forgo reimbursing insurers for unreasonable payments negotiated pursuant to certain settlement and resolution procedures would ignore the plain meaning of "obligate" included in the definition of "ultimate loss" in MCL 500.3104(25)(c).

The MCCA and amici curiae Auto Club Insurance Association and Insurance Institute of Michigan argue that an insurer that has reached the statutory threshold might approve *all* claims, no matter how unreasonable, secure in the knowledge that it will be fully reimbursed by the MCCA. However, our Legislature recognized the possibility that insurers might take inadequate steps to ensure that their review and settlement of catastrophic claims was reasonable and it provided a remedy. MCL 500.3104(7)(g) provides that the MCCA shall do the following on behalf of its member insurers:

---

[9] Although an excessive damages award can be challenged through a motion for remittitur, or appealed, MCR 2.612(C) does not list excessive payments as a ground for relief from a judgment. In other words, an insurer cannot avoid its obligation to pay damages in accordance with a judgment by arguing later that the payments have become unreasonably high.

> Establish procedures for reviewing claims procedures and practices of members of the association. If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member.

MCL 500.3104(7)(g) permits the MCCA to review its members' claims-handling procedures and to intervene if it believes that those procedures are "inadequate to properly service the liabilities of the association . . . ." Thus, if an insurer stops reviewing claims for reasonableness when it reaches the statutory threshold, it runs the risk that the MCCA "may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member," as permitted by MCL 500.3104(7)(g). MCL 500.3104 does not authorize the MCCA to undertake any other sanctions.[10]

### III. MCCA POLICY ARGUMENTS

#### A. LEGISLATIVE INTENT

The MCCA argues that requiring it to pay unreasonable claims under MCL 500.3104 will drive up the costs of insurance and health care, contrary to the intent of

---

[10] This remedy will not pose a significant financial burden on the MCCA because MCL 500.3104(7)(g) allows the MCCA to contract with another entity to adjust or assist in adjusting these claims instead of hiring employees to provide these services, and it may charge the costs of adjusting these claims to the insurers whose claims procedures are under review.

the no-fault act and the public interest.[11] Yet, as discussed earlier, MCL 500.3104 clearly and unambiguously requires that the MCCA reimburse an insurer for 100 percent of the actual loss amounts (above the statutory threshold) that the insurer is obligated to pay in PIP coverages. Again, because the language of this statute is unambiguous, "the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Sun Valley Foods, supra* at 236. We "must give due deference to acts of the Legislature, and . . . not inquire into the wisdom of its legislation." *Oakland Co Bd of Co Rd Comm'rs v Michigan Prop & Cas Guaranty Ass'n*, 456 Mich 590, 613; 575 NW2d 751 (1998). Because the plain language of the statute is the best indicator of the Legislature's intent, we enforce the statute as written. *Sun Valley Foods, supra* at 236.

As discussed earlier, the purpose of MCL 500.3104 is to spread losses resulting from catastrophic injuries among *all* Michigan insurers in order to decrease the risk that the affected insurer will become insolvent. *Preferred Risk, supra* at 714 and n 2. MCL 500.3104(22) provides that the premiums paid by insurers to the MCCA "shall be recognized in the rate-making procedures for insurance rates . . . ."[12] Thus, MCL 500.3104 contemplates that the losses paid by the MCCA, and spread among all its members, will eventually result in premium increases for *all* Michigan insureds.

---

[11] The purpose of the no-fault act is "to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses." *Nelson v Transamerica Ins Services*, 441 Mich 508, 514; 495 NW2d 370 (1992), quoting *Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978).

[12] MCL 500.3104(22) states, "Premiums charged members by the association shall be recognized in the rate-making procedures for insurance rates in the same manner that expenses and premium taxes are recognized."

Under the MCCA's interpretation, the losses resulting from payments that the MCCA considers unreasonable will *not* be spread out and must be absorbed by the affected insurer alone. If the insurer cannot absorb the loss, it may become insolvent. Otherwise, the loss will be spread among its policyholders, resulting in higher premiums for that company's policyholders only. Those policyholders may then seek coverage elsewhere, further increasing the risk that the affected insurer will become insolvent. Thus, the MCCA's interpretation will increase the risk of insolvency for Michigan insurers, in plain contravention of the purpose of MCL 500.3104.

### B. ABSURD AND UNJUST RESULT

The MCCA also argues that the trial court's interpretation of the statute was erroneous because it led to an absurd and unjust result. In *Decker v Flood*, 248 Mich App 75, 84; 638 NW2d 163 (2001), this Court considered whether the "absurd result" rule of statutory construction could be applied to interpret an unambiguous statute. The *Decker* Court stated:

> [O]ur Supreme Court repudiated the use of the "absurd result" rule of statutory construction in a case such as this where the language of the statute is unambiguous. *People v McIntire*, 461 Mich 147, 155-158; 599 NW2d 102 (1999). The Supreme Court's decision in *McIntire* precludes this Court from utilizing rules of statutory construction to impose policy choices different from those selected by the Legislature. *Id.* at 152. " '[I]n our democracy, a legislature is free to make inefficacious or even unwise policy choices. The correction of these policy choices is not a judicial function as long as the legislative choices do not offend the constitution.' " *Id.* at 159, adopting as its own the language of Judge YOUNG's dissent in *People v McIntire*, 232 Mich App 71, 126; 591

NW2d 231 (1998). Clearly, it is not within our authority to second-guess the wisdom or reasonableness of unambiguous legislative enactments even where the literal interpretation of the statute leads to an absurd result. [*Id.* at 84.]

As discussed earlier, MCL 500.3104 is clear and unambiguous with regard to the requirement that the MCCA reimburse an insurer for 100 percent of the actual loss amounts (above the statutory threshold), that the insurer is obligated to pay under PIP coverages. Accordingly, the statute must be enforced as written. We will not apply the absurd and unjust results doctrine to reach a result at odds with the plain language of the statute. Courts may not second-guess the wisdom of legislation. *Elezovic v Ford Motor Co*, 472 Mich 408, 425; 697 NW2d 851 (2005).

### C. DEFERENCE TO AGENCY INTERPRETATION

Finally, the MCCA asserts that the trial court failed to give due deference to the Office of Financial and Insurance Service's (OFIS) alleged longstanding interpretation of MCL 500.3104 to not only permit, but require, the MCCA to conduct reasonableness reviews of insurers' claims for reimbursement.[13] Similarly, the MCCA and amicus curiae Auto Club Insurance Association argue that the MCCA's plan of operation, approved by the OFIS, impliedly requires reasonableness review. Yet although this Court affords great deference to an agency's interpretation of the statute it is charged with enforcing, no such deference is due when the agency's "interpretation is clearly wrong." *Hoste v Shanty Creek Mgt, Inc*, 459 Mich 561, 569; 592 NW2d 360 (1999); *Robinson v Shatterproof Glass Corp*, 238 Mich App 374,

---

[13] The OFIS is the department charged with executing the Insurance Code, MCL 500.100 *et seq.*, including the no-fault act.

378; 605 NW2d 677 (1999). The OFIS's interpretation and the MCCA's plan of operations contravene the plain language of the statute. Therefore, these interpretations are not entitled to deference.[14]

IV. CONCLUSION

Because MCL 500.3104 requires the MCCA to reimburse its members for their actual losses above the statutory threshold, without regard to reasonableness, USF&G and Hartford were both entitled to judgment as a matter of law. In Docket No. 260604, the trial court did not err in granting summary disposition to USF&G under MCR 2.116(C)(10). In Docket No. 271199, the trial court erred in denying Hartford's motion for summary disposition

---

[14] Further, we note that, although our Supreme Court agreed with the MCCA interpretations of other provisions of the no-fault act in *Preferred Risk, supra,* it did not defer to the MCCA's interpretation of the statute. In *Preferred Risk,* our Supreme Court resolved a dispute concerning the MCCA's practice of restricting PIP reimbursements to insureds who were Michigan residents. (Our Supreme Court understood the term "resident," for the purpose of the no-fault act, to refer "not only to those insureds who actually live within this state ... but also to certain insureds who do not live within this state but who are nonetheless required to register, and thus insure, their vehicles in this state." *Id.* at 714.) Although our Supreme Court agreed with the MCCA's practice and interpretation, it noted:

> We wish, however, to emphasize that the analysis which follows in support of this conclusion is based solely upon our interpretation of the Catastrophic Claims Act itself. In particular, we emphasize that our analysis does not rest upon any finding by this Court that the association's plan of operation constitutes a "reasonable interpretation" of § 3104 in light of the Legislature's deference to its expertise in this area. *In our opinion, the Legislature did not leave it up to the [MCCA] to decide who will receive indemnification.* As plaintiff aptly argues, the requirement in § 3104(2) that the [MCCA] "shall provide" indemnification for losses in excess of $250,000 can hardly be called deferential. Thus, while we agree with the [MCCA's] interpretation of § 3104(2)'s indemnification requirement, we do so on the basis of the language of the statute itself. [*Id.* at 720 (emphasis added).]

under MCR 2.116(C)(10).[15] Because the interpretation of MCL 500.3104 is purely a question of law, summary disposition is not premature, even if no discovery was conducted below.[16]

Order granting summary disposition to USF&G in Docket No. 260604 is affirmed. Order denying Hartford's motion for summary disposition in Docket No. 271199 is reversed and that case is remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

WHITE, J. (*concurring*). I concur in the majority's conclusion that the Michigan Catastrophic Claims Association (MCCA) is required to provide full reimbursement for amounts paid under personal protection insurance coverage. While in retrospect the settlement in the Migdal case might seem excessive, there is no allegation or indication that it was entered into in bad faith, or without consideration of the amounts the United States Fidelity & Guaranty Company might be required to pay if it took the case to trial. Similarly, there is no indication that Hartford Insurance Company of the Midwest acted in bad faith in agreeing to pay $30 an hour for attendant care in exchange for a three-year freeze of the rate. Most important, there is no indication that either insurer actually applies a double standard in adjusting claims that will ultimately be reimbursed by the MCCA.[1]

---

[15] Because the parties relied on matters outside the pleadings, summary disposition was not proper under MCR 2.116(C)(9). MCR 2.116(G)(5).

[16] Because the MCCA is required to reimburse USF&G and Hartford for 100 percent of the actual amount of PIP benefits (above the statutory threshold) that these insurers paid to insureds, the question whether USF&G's and Hartford's payments to Migdal and Allen are reasonable does not preclude summary disposition.

[1] As the majority observed, if this were asserted, one would expect the MCCA to exercise its powers under MCL 500.3104(7)(g).

Under the statutory framework, the determination of reasonableness is to be made by the insurer, or the judicial system after litigation. Whatever payments then result are the amounts that the insurer is "obligated to pay," and that are "payable," under personal protection insurance coverage, within the meaning of MCL 500.3104(2) and (25)(c). This is the amount for which the MCCA must provide, and the insurer must accept, indemnification. The statute does not contemplate that the MCCA will become a party to the insurance contract, or possible litigation, between the insured and the insurer, with a voice regarding whether a lesser or greater sum is reasonable under MCL 500.3107. Nor does it contemplate that the MCCA will act as a de facto regulatory body, determining what amounts are reasonable for which services.