YOUNG, J.
(dissenting). I respectfully dissent.
On December 29, 2008, this Court decided these cases.[1] Today, just a few months later, a new majority[2] reverses that decision and it does so without even affording the parties an opportunity to brief and argue why this reversal is warranted. Although not relevant to my analysis of the substantive issue in these cases,[3] the costs that the majority’s decision will impose on Michigan drivers is relevant to assessing the majority’s hurried approach and policy-based reversal of this *27 Court’s prior decision. As I will discuss later, the majority’s decision will cause every Michigan resident who owns and insures an automobile to pay a 19 percent higher annual surcharge premium for mandatory catastrophic coverage. The cost of the majority’s decision to those with insured automobiles will be an estimated $693.8 million more for the coming year alone.[4]
I. WHAT CHANGED?
The facts have not changed. The text of the statute at issue has not changed. The parties’ arguments have not changed. And the rationale advanced in the opinions of this Court has not changed. Yet, within a matter of months, a decision of this Court, thoughtfully briefed, argued, and considered by seven justices, is no longer worth the paper it was written on. Even the casual observer, however, does not really need to ask why. The reason is obvious: On January 1, 2009, the composition of this Court changed.
II. WHY IS THIS CASE BEING REHEARD?
This case was argued on October 1, 2008. On November 4,2008, Justice HATHAWAY defeated then-Chief Justice TAYLOR in the election for his seat on this Court. This case was decided on December 29, 2008, with former Chief Justice TAYLOR casting his vote with the majority.
*28 The new majority’s opinion today offers no new rationale or argument. In fact, it is merely an extended quotation of Justice WEAVER’S former dissent.
For over a century this Court has adhered to the principle that a motion for rehearing should be denied unless a party has raised an issue of fact or law that was not previously considered but which may affect the outcome.[5] Indeed, this Court codified that principle in our court rules.5 [6]
As Justice Weaver’s former dissent in these cases and the majority’s new opinion make obvious, the parties have not raised a new issue of fact or law to merit rehearing. The only difference is in the membership of this Court. As early as 1883, this Court had the wisdom to realize that such a change is not a proper ground for rehearing. In Peoples v Evening News Ass’n,[7] this Court’s opinion on a motion for rehearing stated in its entirety:
*29 This case having been heard and decided when three judges only were sitting, and a change in the Court having taken place and a further change being [about] to occur on the first of January, a motion is now made for a rehearing at the next January term before the full Court as it will then be constituted.
Held, unanimously, that a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur.[8]
By ordering rehearing simply because a change in the Court has taken place, the new majority has overruled the longstanding and clear principle of Peoples.8 [9] Will any change in an assigned judge now justify the reopening of a predecessor’s ruling?
It is apparent that the new majority feels unencumbered by such principles — even one that has endured for more than 100 years. And, perhaps, its members no longer feel a need to be cosseted by the concerns and beliefs that they professed to have for the past decade when they were members of the philosophical minority of this Court. Indeed, Chief Justice KELLY once exclaimed that a recent decision of the Court being reconsidered “has hardly had time to become outmoded.”[10] Justice CAVANAGH similarly protested that “ [i]f a majority of the Court believes that reconsideration should be granted, then I believe that the proper course would be to receive briefs and hear arguments on *30 the defendant’s constitutional argument before remanding the case to the trial court.”[11]
Because nothing in the facts, arguments, or legal rationale has changed, I continue to support this Court’s original decision and do not feel the need to restate it in its entirety here.
III. FACTS AND PROCEDURAL HISTORY
The facts and procedural history of these consolidated appeals are simple, uncontested, and have been set out by this Court in detail three times.
The central question here is whether an insurance company that strikes a bad bargain with its insured may fob off on the Michigan Catastrophic Claims Association (MCCA), a nonprofit entity created by the Legislature to spread the costs associated with catastrophic automobile injuries, these “unreasonable” expenses. In our earlier decision, we held that the MCCA had explicit *31 statutory authority to resist assuming responsibility for an insurance company’s unreasonable payouts.
Plaintiff United States Fidelity & Guaranty Company (USF&G) entered into a consent judgment with its insured, Daniel Migdal, which resulted in USF&G paying $54.84 an hour for attendant care services.[12] Plaintiff Hartford Insurance Company of the Midwest (Hartford) entered into a settlement agreement with its insured, Robert Allen, which required that Hartford pay $30 an hour for attendant care services. The MCCA refused to indemnify USF&G and Hartford beyond a rate of $22.05 and $20 respectively, rejecting the higher amounts as “unreasonable.”
Plaintiffs brought these actions seeking declaratory judgments that the MCCA was required to reimburse the full rate of attendant care services that they paid their insureds. The circuit courts entered conflicting judgments and the aggrieved parties appealed. The *32 Court of Appeals consolidated the appeals and held that “the MCCA is statutorily required to reimburse an insurer for 100 percent of the amount that the insurer paid in PIP [personal protection insurance] benefits to an insured in excess of the statutory threshold listed in MCL 500.3104(2), regardless of the reasonableness of these payments.”[13] The MCCA sought leave to appeal in this Court, which was granted, and this Court held that “when a member insurer’s policy only provides coverage for ‘reasonable charges,’ the MCCA has authority to refuse to indemnify unreasonable charges.”[14]
Because the composition of this Court changed on January 1, 2009, USF&G and Hartford sought rehearing[15] and the new majority granted this motion “without further briefing or oral argument.”[16]
TV. DISCUSSION
As previously noted, at issue is whether the MCCA has the authority to refuse to indemnify member insurers for unreasonable payments they make to their policyholders. I agree with many points of the majority’s new opinion, but the points of my disagreement are significant and the results of our differences will be extremely costly to the citizens of Michigan.
*33 I agree that “personal protection insurance benefits” are not the same as “personal protection insurance coverages.”[17]1 further agree that “the term ‘coverage’ is a broader term than ‘benefits.’ ”[18] I particularly agree with each of the definitions for “coverages” cited by the new majority.[19] “ ‘[C]overage’ refers to protection afforded by an insurance policy or the sum of risks assumed by an insurance policy”[20]1 disagree, however, with the new majority’s refusal to interpret “coverages” consistent with the definitions that it cites — a reference to the underlying insurance policy.
The majority states its holding: “the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers.”[21] That is true but unresponsive to this Court’s holding in *34 USF&G I. This Court did not previously incorporate the § 3107 standard for personal protection insurance (PIP) benefits into § 3104(2). Rather, this Court, consistent with the definitions advanced by the majority, interpreted “coverages” as the “protection afforded by an insurance policy” and explained that “the member insurer’s policy will ultimately control the standard for the MCCA’s review because the policy establishes the ‘personal protection insurance coverages.’ ”[22]
Referring to the consent judgment and settlement agreement at issue, the new majority contends that “ [tjhis contractual liability, or coverage, owed by each insurer is the total amount agreed to between the original contracting parties.”[23] The fallacy in this assertion is that the consent judgment or settlement agreement is “coverage.” As amply demonstrated by the definitions that the majority cites, “coverage” refers to the underlying policy purchased by the insured. That policy is the only relevant contract. The consent judgment and settlement agreement are separate contractual, albeit judicially sanctioned, agreements. They are distinctly not “the no-fault personal protection insur *35 anee coverages that are generally the subject of the act, i.e., those which were written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the ‘owner or registrant of a motor vehicle required to be registered in this state’. .. .”[24] Because the majority offers no principled rationale for departing from the definitions that it cites or this Court’s prior interpretation of “personal protection insurance coverages,” I must respectfully dissent.
The majority makes additional erroneous assertions. First, the majority asserts that member insurers will have an incentive to make reasonable settlements of catastrophic claims because, if they do not, the MCCA premiums will increase.[25] The majority appears unaware of how incentives, or the MCCA, work. The premium that the MCCA charges to cover the liabilities it must statutorily assume is evenly distributed among the member insurers[26] and then passed on to those who *36 buy no-fault insurance.[27] Indeed, this Court has been informed that in response to the order granting rehearing in this case, the MCCA raised its rates by 19 percent per policy (or $693.8 million more for MCCA assessments in the aggregate for this year) to create the reserves necessary to pay the more expansive claims for unreasonable charges that the new majority’s opinion permits. Contrary to the new majority’s belief that an insurer will have an economic incentive to bargain for “reasonable” payments to its insureds, the majority opinion will have the perverse effect of eliminating an insurer’s incentive to negotiate reasonable settlements. Indeed, instead of providing insurers a protective shield against unreasonable catastrophic claims, the majority opinion provides no-fault plaintiffs’ attorneys a lethal sword against an insurer that insists on a reasonable settlement. MCL 500.3148(1) provides that a claimant’s attorney fee is charged to the insurer “if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment.” Under the majority’s decision, an insurer has no reason to refuse any claim; thus, a claimant’s attorney can use the threat of attorney fees to force an insurer into an unreasonable settlement.[28] Under the majority’s decision, insurers will be encouraged to negotiate wrereason *37 able settlements and pass these off onto the MCCA. As stated, any liability that the MCCA must assume is eventually passed on to anyone in Michigan who must buy auto insurance.
Perhaps the majority can explain why the legislative method for containing costs for Michigan’s no-fault insurance customers is an inferior purpose to their preferred policy objective. In particular, why is it an inferior purpose at a time when the Governor has requested an auto insurance rate freeze[29] and unemployment in Michigan has exceeded 14 percent?[30]
My point is not that our decision should be premised on keeping no-fault insurance affordable. Indeed, I maintain that such “ ‘[p]olicy decisions are properly left for the people’s elected representatives in the Legislature’ ”[31] and that the Legislature has made the policy decision in this case. Rather, I raise this issue because elections matter. The majority has seen fit to engage in its own policy-making while relying on erroneous assumptions. This is a lethal combination that will result in harmful, unintended consequences. While it may be *38 politically expedient to position oneself as “looking out for the little guy,”[32] this case is an excellent example of how acting on such an altruistic impulse rather than applying the law results in a negative consequence for the vast majority of our citizens. In this context, each of us who must purchase this mandatory no-fault coverage is a “little guy.”[33]
Second, the majority emphasizes that the MCCA may only adjust a member insurer’s “practices and procedures.”[34] The majority then immediately (and inconsistently but accurately) concedes that MCL 500.3104(7)(g) permits the MCCA to “adjust or assist in the adjustment of claims” and “[wjhen the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the *39 member insurer.”[35] I previously agreed with these propositions.[36] Thus, I struggle to comprehend for what purpose the majority resists the simple proposition that the MCCA is statutorily authorized to adjust claims.
Third, “[p]laintiffs argue[d] that if the MCCA may reject member insurer claims on the basis of the reasonableness of the charges, member insurers will need to seek assurances that the MCCA will reimburse certain payments before making them, thus delaying payment.”[37] The prospect of delayed payment seems to be a primary concern that drives the new majority’s analysis. In support of its construction, it contends:
If this Court were to accept the MCCA’s argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. Member insurers might then force a jury trial with every catastrophically injured claimant in order to secure a verdict with a “reasonable” stamp on the result.[38]
The majority employs this policy-based rationale to depart from its own definitions of “coverages” because otherwise “[t]his outcome goes against the legislative purpose of ensuring efficient and quick recovery for claimants in the no-fault system.”[39] The majority fails to explain, however, how its alternative construction actually resolves the issue. In fact, it does not.
The majority concedes that the MCCA has authority to “requir[e] submission of proposed settlement agree *40 ments for approval. .. .”[40] This is the very outcome that the plaintiff insurance companies here sought to avoid. Indeed, I believe that “requiring submission of proposed settlement agreements” or “seeking assurances that the MCCA will reimburse certain payments” would have been a natural consequence of USF&G I, because it actually gave meaning to the plain language of this statute. The MCCA is likely to act on the majority’s advice (indeed, it should) and mandate that member insurers afford it the opportunity to object to proposed settlements or other agreements before they become binding. Ironically, it appears that even the majority does not deny that the MCCA has this statutory power.
Thus, the issue of delay is not resolved by the majority’s opinion. Moreover, the majority’s opinion does not address circumstances, like the present cases, where the MCCA was not afforded an opportunity to reject the agreements, which likely explains the $693.8 million bill that will be passed onto and shared by every Michigan automobile owner because of the increased and uncontrolled liability that the new majority’s opinion will create for the MCCA.
We, as jurists, are ill-prepared to make complicated policy-based judgments unrelated to the policy choices that the Legislature has enacted. We do the least damage when we merely follow the Legislature’s lead by giving the words of a statute a plain reading and enforc *41 ing the statute as written. “The Legislature, unlike the judiciary, is institutionally equipped to assess the numerous trade-offs associated with a particular policy choice.”[41] The Legislature has made difficult choices, and it used particular words with particular meanings to convey those choices. Our prior opinion respected our role as jurists, and the Legislature’s role as policy-maker, by interpreting the relevant statutory language in a manner consistent with the plain meaning of the words chosen by the Legislature. In an effort to avoid the meaning of the words chosen by the Legislature, the new majority has engaged in a wandering, policy-based analysis that is as flawed as it is misguided. It is an expensive mistake for which every policyholder in Michigan will pay.
Undeterred and aiming to quell the likely negative response to its policy-based decision, the new majority asserts that my concerns “appear[] highly speculative and, indeed, unfounded.”[42] My concerns will cease to be “highly speculative” and “unfounded” when they are reflected in the MCCA’s annual assessments. Michigan drivers will soon receive their no-fault insurance bills (I have received mine) with the updated higher MCCA assessment for the fiscal year beginning July 1, 2009. At that point, Michigan drivers will be free to determine for themselves whether my concerns are sound and based in reality.
Accordingly, I respectfully dissent.
Corrigan, J., concurred with Young, J.
*42 APPENDIX
[[Image here]]
*43 [[Image here]]

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 482 Mich 414; 759 NW2d 154 (2008) (hereinafter USF&G I).

 I note that the majority in this case is the new philosophically aligned majority: Justices Weaver, Cavanagh, and Hathaway and Chief Justice Kelly.

 See USF&G I, supra at 432 n 32.

 In response to the motions for rehearing, the Michigan Catastrophic Claims Association (MCCA) has conducted an actuarial assessment to detail the expected increase in auto insurance premiums that reversal of our original decision will produce — 19 percent more in catastrophic claims premiums to be precise. See the affidavit of Gloria Freeland in support of appellant’s supplement to its answer to appellee’s motion for rehearing, attached hereto as an appendix.

 See Nichols, Shepard & Co v Marsh, 62 Mich 439, 440; 29 NW 37 (1886); Thompson v Jarvis, 40 Mich 526, 526 (1879).

 See MCR 2.119(F)(3), which provides:
Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.
The new majority states that MCR 2.119(F)(3) “creates a ‘palpable error’ standard for rehearing cases.” Ante at 12 n 12. The actual standard created is: “a palpable error by which the court and the parties have been misled . ...” Neither the parties nor the new majority suggest that this Court was previously misled. Plaintiffs and the new majority simply disagree with this Court’s prior opinion for the reasons previously stated in the flawed analysis of Justice Weaver’s dissent.

 51 Mich 11; 16 NW 185 (1883).

 Id. at 21.

 The restraint demonstrated by this Court in Peoples has been duplicated by other courts denying rehearing when the sole basis is a change in the composition of the court. See Golden Valley Co v Greengard’s Estate, 69 ND 171, 190; 284 NW 423 (1938); Gas Products Co v Rankin, 63 Mont 372; 207 P 993 (1922); Wolbol v Steinhoff, 25 Wyo 227, 258; 170 P 381 (1918); Woodbury v Dorman, 15 Minn 341 (1870); Stearns v Hemmens, 3 NYS 16 (NY Comm Pl, 1888).

 McCready v Hoffius, 459 Mich 1235, 1236 (1999) (KELLY, J., dissenting).

 Id. at 1236-1237 (Cavanagh, J., dissenting) (emphasis added). Unlike this case, the defendants in McCready cited new authority for their position. Nevertheless, Chief Justice Kelly and Justice Cavanagh were adamant that this Court erred by considering the new authority on rehearing. It is indeed at least curious that Chief Justice Kelly and Justice Cavanagh opposed the remand order in McCready, which was premised on new authority, but freely joined this Court’s order for rehearing “without further briefing or oral argument,” United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 483 Mich 918 (2009), and the reversal of this Court’s opinion without any new issues being raised.
Moreover, I find it odd that Justice Hathaway, who, during her Supreme Court campaign, actively promoted the fabrication that former Chief Justice Taylor slept through the oral argument of McDowell v Detroit, 477 Mich 1079 (2007), finds it appropriate to cast her vote to overturn this Court’s decision without so much as attending argument on this case or allowing the party opposing the motion to have its day in court. See minutes 4:28 to 4:40 of the video at <http://www.youtube.com/watch?v=_7woWJDklQg> (accessed June 3, 2009).

 The debate here is not whether an insurance company may refuse to fully compensate a catastrophically injured insured. Indeed, the plaintiff insurance companies were required to fully compensate their insureds under USF&G I. The question is whether an insurance company can agree to overcompensate its insured and escape this burden by having the rest of Michigan policyholders pay for that bad bargain. This very issue is well illustrated by the facts of USF&G I itself.
The rate that USF&G pays its insured, Daniel Migdal, to cover costs associated with his catastrophic injuries is so inflated that his father (Daniel’s “caregiver”) started a company, Medical Management, to make a profit from the arrangement. From the $54.84 hourly payments that USF&G makes, Medical Management pays the nurses (who actually provide Daniel’s care) an average of $32 an hour (including benefits!) and retains the remainder of the USF&G hourly payment for itself. So inflated was the USF&G payment that, after paying for all of Daniel’s care, Medical Management earned from this arrangement approximately $200,000 in profits for 2003. Under the majority’s new opinion, it will he Michigan policyholders, not USF&G, who will pay for the profits of Daniel’s father.

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 274 Mich App 184, 192; 731 NW2d 481 (2007).

 USF&G I, supra at 417.

 In its reply brief filed February 19, 2009, USF&G argued that “this Court’s practice of granting rehearing requests based on nothing more than a view of a majority of the Justices that the Court’s original opinion is incorrect... is as it should be, given this Court’s status as a court of last resort.” This statement both ignores Peoples and betrays plaintiffs’ motivation for seeking rehearing.

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 483 Mich 918 (2009).

 Ante at 14. Justice Weaver asserts that “the terms ‘benefits’ and ‘coverages’ are related because of their close proximity in the statute... .” Ante at 15. I am unfamiliar with this tenet of statutoiy construction, and Justice Weaver offers no authority for it. Indeed, whether separated by two words or two hundred, I believe that the meaning of “benefits” and “coverages” are related, but distinct.

 Ante at 15.

 Ante at 15, quoting LeBlanc v State Farm Mut Auto Ins Co, 410 Mich 173, 204; 301 NW2d 775 (1981), for the proposition that “ ‘Moverage’, a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance.” The new majority also cites the following consistent definitions: (1) the “[ejxtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities”; (2) “protection against a risk or risks specified in an insurance policy”; (3) “the risks within the scope of an insurance policy”; and (4) the “amount, and extent of risk covered by insurer.” Ante at 16, quoting Webster’s II New College Dictionary (1995); Random House Webster’s College Dictionary (2001); Black’s Law Dictionary (7th ed); and Black’s Law Dictionary (5th ed). See USF&G I, supra at 431 n 31.

 USF&G I, supra at 431 n 31 (emphasis added), quoting Jarrad v Integon Nat’l Ins Co, 472 Mich 207, 217; 696 NW2d 621 (2005).

 Ante at 6; see also ante at 25.

 USF&G I, supra at 430-431; id. at 431 n 31 (“Thus, the terms of the policy control the standard for the MCCA’s review.”). This fundamental distinction was underscored by Justice Markman in his concurrence:
The dissent is correct that the reasonableness requirement of MCL 500.3107 is not integrated into the indemnification clause set forth in § 3104(2). [USF&G I, supra] at 457 [(Weaver, J., dissenting)]. However, the majority opinion does not attempt to incorporate this requirement into the MCCA’s statutory power to review a member insurer’s claim to ensure it is in compliance with the policy. Rather, it holds that the MCCA can review a member’s claim for compliance with the policy, which, as represented by both parties, generally includes a requirement that member insurers reimburse only reasonable claims based on § 3107. [USF&G I, supra at 434 n 1 (Markman, J., concurring).]

 Ante at 16 (emphasis added).

 In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass’n), 433 Mich 710, 723; 449 NW2d 660 (1989). See also USF&G I, supra at 437-439 (Markman, J., concurring) (explaining that the consent judgment and settlement agreement are not part of the member insurer’s “coverages” because “[a] member insurer that informs the MCCA that it will only pay ‘reasonable’ claims, but then subsequently modifies the policy after the accident occurs to include unreasonable claims, has essentially sought reimbursement for claims for which it has not paid premiums”).

 Ante at 17 n 19.

 See MCL 500.3104(7)(d), which provides in pertinent part:
Each member shall be charged an amount equal to that member’s total written car years of insurance providing the security required by [MCL 500.3101(1)] or [MCL 500.3103(1)], or both, written in this state during the period to which the premium applies, multiplied by the average premium per car. The average premium per car shall be the total premium calculated divided by the total written car years of insurance providing the security required by section 3101(1) or 3103(1) written in this state of all members during the period to which the premium applies.

 See USF&G I, supra at 432 n 32; In re Certified Question, supra at 729 (explaining that the MCCA premiums are “inevitably” “passed on” to Michigan’s no-fault insurance customers); MCL 500.3104(22) (which provides that “[p]remiums charged members by the association shall be recognized in the rate-making procedures for insurance rates in the same manner that expenses and premium taxes are recognized”).

 The MCCA provided a useful hypothetical conversation between a future plaintiffs no-fault attorney and an insurer:
[Attorney]: I know that amount is a bit high for attendant care, but that is what we want. We’ll sue to get it and we’ll seek attorney fees and penalties too. [MCL 500.3148(1)] Do you want that?
*37 Insurer: Of course not, but that amount is unreasonable.
[Attorney]: What does reasonable have to do with it? [The] MCCA has to pay you regardless. Do you want to incur three times that amount in attorney fees instead?
Insurer: Of course not.

 See Executive Directive No. 2009-1.

 See Louis Aguilar, Michigan’s jobless rate 14.1%, highest since ’83, Detroit News, June 18, 2009; Heather Lockwood, State jobless rate of 14.1% is highest — since July ’83, Lansing State Journal, June 18, 2009, available at <http://www.lansingstatejournal.com/atricle/20090618/ NEWS01/906180327> (accessed June 28, 2009).

 USF&G I, supra at 432 n 32, quoting Devillers v Auto Club Ins Ass ’n, 473 Mich 562, 589; 702 NW2d 539 (2005).

 See, e.g., Todd C. Berg, Hathaway attacks, but sketchy on incumbent’s record, Michigan Lawyers Weekly, October 7, 2008, p 14 (“The centerpiece of Hathaway’s campaign against Taylor has been her claim that he rules against middle-class families and in favor of ‘big insurance companies and corporate special interests.’ ”); Todd C. Berg, Hathaway’s campaign pledge may support MSC office closure, Michigan Lawyers Weekly, December 15, 2008, p 1 (“Justice-elect Diane M. Hathaway ran for the Michigan Supreme Court on the platform that she would stand up for middle-class families and oppose the lavish perks and benefits that Supreme Court justices were bestowing on themselves.”).

 The exception, of course, is the lawyer who makes a living doing no-fault insurance work. For such practitioners, the majority’s opinion creates a new submarket of opportunity. See note 28 of this opinion.

 Ante at 21-22. See MCL 500.3104(7)(g), which provides that the MCCA shall
[ejstablish procedures for reviewing claims procedures and practices of members of the association. If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member.

 Ante at 22 n 24.

 USF&G I, supra at 430 n 30.

 Id. at 432 n 32.

 Ante at 19.

 Ante at 19.

 Ante at 22. The majority acknowledges this authority within the context of reading MCL 500.3104(7)(g) in conjunction with § 3104(7)(b), which provides that the MCCA shall
[ejstablish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the purpose of reporting claims, the member shall in all instances consider itself legally liable for the injuries or damages. The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim. [Emphasis added.]

 Devillers, supra at 589. Indeed, the new majority’s response to my dissent underscores this point. The new majority asserts that “there is no evidence that defendant has routinely or even occasionally challenged the reasonableness of insurers’ settlements” and “it is unknown whether the actuarial assessment factored in the effect of defendant’s potential use of [MCL 500.3104(7)(g)].” Ante at 24. The Legislature, unlike this Court, has the means to obtain the answers to those questions.

 Ante at 23.