WEAVER, J.
(dissenting). This Court granted leave to appeal to consider whether MCL 500.3104(2) obligates the Michigan Catastrophic Claims Association (MCCA) to reimburse a member insurer for personal protection insurance (PIP) benefits paid to a claimant without regard to the reasonableness of the member insurer’s payments of PIP benefits.
I dissent and would hold that the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the “practices and procedures” of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Moreover, I would hold that the power granted to the MCCA under MCL 500.3104(8)(g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes. Finally, although the MCCA has no right to directly challenge the reasonableness of a claim, the no-fault statute does provide the MCCA with safe *440 guards against negligent actions of member insurers. Accordingly, I would affirm the judgment of the Court of Appeals.
I. FACTS AND PROCEDURAL HISTORY

UNITED STATES FIDELITY INSURANCE & GUARANTY CO v MCCA

In the first case of these consolidated appeals, Daniel Migdal was injured in a 1981 car accident in which he incurred catastrophic injuries. His injuries included a traumatic brain injury with cerebral spastic quadriplegia, severe oral motor apraxia, and dysphasia. Because of the extent of the injuries, Daniel was prescribed, and received, 24-hour-a-day nursing care. In 1988, Michael Migdal (Mr. Migdal), Daniel’s father and the conservator of Daniel’s estate, sued the no-fault insurance provider, United States Fidelity Insurance & Guaranty Company (USF&G), to recover expenses paid for Daniel’s care. In 1990, the parties entered into a consent judgment. Pursuant to the judgment, USF&G paid Mr. Migdal $35,000 in exchange for a release from all contractual liability for nursing care provided before May 10, 1989. Additionally, USF&G agreed to pay $17.50 an hour for Daniel’s home nursing care for the following year.[1] The payments would be rendered regardless of whether Daniel’s parents provided the nursing care or a third party was brought in to provide the care. The hourly rate, fixed for the first year after the *441 judgment, was subject to an annual increase of 8.5%. The increased rate would be compounded based on the previous year’s rate.
Pursuant to the consent judgment, USF&G paid Mr. Migdal the consented-to hourly wage.[2] Once the amount paid to Mr. Migdal had reached the statutory threshold amount of $250,000,[3] the MCCA began to reimburse USF&G for payments made to Mr. Migdal that exceeded the threshold. However, the MCCA ultimately refused to reimburse USF&G for the amount over $250,000 that USF&G paid Mr. Migdal under the consent judgment. In 2003, USF&G filed a complaint in the Oakland Circuit Court for a declaratory judgment that the MCCA must reimburse USF&G for the total amount that USF&G paid to Mr. Migdal under the consent judgment, regardless of the reasonableness of the amount. At the time, USF&G was paying $54.84 an hour to Mr. Migdal for Daniel’s nursing care.[4] The MCCA sought to only be required to reimburse USF&G at a rate of $22.05 an hour, arguing that the agreed-upon rate of $54.84 an hour was unreasonable and, therefore, the MCCA should not have to reimburse *442 USF&G for the total amount. Meanwhile, USF&G sought to have the consent judgment with Mr. Migdal revised, arguing that circumstances changed when Mr. Migdal hired a third party to care for Daniel instead of providing the nursing care himself. Mr. Migdal filed a motion for summary disposition for failure to state a claim. The court granted Mr. Migdal’s motion.[5]
Likewise, the MCCA made a motion for summary disposition. It contended that there was no question of material fact that the payments made by USF&G to Mr. Migdal were unreasonable. Moreover, the MCCA argued that the no-fault act only required reimbursement of payments that are reasonable. In a countermotion for summary disposition, USF&G argued that the no-fault act required the MCCA to reimburse it for the full amount paid to Mr. Migdal, despite any unreasonableness regarding the amount paid. Alternatively, USF&G argued that there was a question of material fact concerning the “unreasonableness” of the consent judgment.
The trial court granted USF&G’s motion for summary disposition, ruling that the MCCA must reimburse USF&G for its “ultimate loss,”[6] which included the entire amount that USF&G had to pay Mr. Migdal regardless of whether the amount paid was reasonable. The trial court denied the MCCA’s motion for summary disposition. The trial court entered a judgment requiring the MCCA to reimburse USF&G in the amount of $1,725,072 under the no-fault act and holding the MCCA liable for future payments consistent with the *443 consent judgment. The parties agreed to stay the enforcement of the order while the MCCA appealed by right in the Court of Appeals.

HARTFORD INS CO v MCCA

In the second case of these consolidated appeals, Robert Allen was injured in a 2001 car accident in which he incurred catastrophic injuries. His injuries included right-sided pleuritic effusion, brain injuries, quadriparesis, bilateral frozen shoulder, and cardiopathy. Because of the extent of the injuries, Allen was prescribed, and received, 24-hour-a-day care by a licensed nurse. Hartford Insurance Company of the Midwest (Hartford), Allen’s no-fault insurer, initially paid $20 an hour for the nurse. In 2003, Hartford agreed to pay an increased rate of $30 an hour for Allen’s care. Soon thereafter, Hartford’s payments for Allen’s care exceeded the $250,000 statutory threshold.
The MCCA refused to reimburse Hartford for any payments above $20 an hour for the services rendered. Hartford filed a complaint for a declaratory judgment that would require the MCCA to pay Hartford $571,847.21 as reimbursement for payments exceeding the no-fault threshold. Additionally, Hartford sought a declaration that the MCCA must reimburse Hartford for the total payments above the $250,000 threshold, regardless of the reasonableness of the payments. After the initial filing, Hartford moved for summary disposition, arguing that the no-fault act required the MCCA to reimburse Hartford for the entire amount paid to Allen that exceeded the threshold, regardless of the reasonableness of that amount. The MCCA argued that it only had to reimburse Hartford for reasonable payments and that there was insufficient discovery concerning the reasonableness of the amount of the pay *444 ments. The circuit court judge ruled that reasonableness was an element in determining how much the MCCA must reimburse Hartford and that there was insufficient discovery to determine whether the payments were reasonable. Hartford immediately appealed the trial court’s holding requiring the element of reasonableness to be considered.
THE COURT OF APPEALS DECISION
The Court of Appeals consolidated the USF&G and Hartford cases and held that “MCL 500.3104 does not incorporate a ‘reasonableness’ requirement and requires the MCCA to reimburse insurers for the actual amount of PIP benefits paid in excess of the statutory threshold.”[7] (Emphasis in the original). The MCCA sought leave to appeal in this Court, and this Court granted leave.[8]
II. STANDARD OF REVIEW
Statutory interpretation is a question of law, which this Court reviews de novo. In re Investigation of March 1999 Riots in East Lansing (People v Pastor), 463 Mich 378, 383; 617 NW2d 310 (2000). This Court reviews de novo a trial court’s decision regarding a motion for summary disposition. Herald Co v Bay City, 463 Mich 111, 117; 614 NW2d 873 (2000).
III. ANALYSIS
The issue before this Court involves how much of a member insurer’s coverages the MCCA must indemnify in the event of a catastrophic injury. Specifically, is the *445 MCCA liable for reimbursement of PIP payments based on potentially unreasonable claims?
The outcome of these cases depends on this Court’s interpretation of the language in MCL 500.3104. An overarching rule of statutory construction is “that this Court must enforce clear and unambiguous statutory provisions as written.” In re Certified Question Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass’n, 433 Mich 710, 721; 449 NW2d 660 (1989) (quotations omitted). “If the language of [a] statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written.” Sun Valley Foods Co v Ward, 460 Mich 230, 236; 596 NW2d 119 (1999). However, “what is ‘plain and unambiguous’ often depends on one’s frame of reference.” Shiffer v Gibraltar School Dist Bd of Ed, 393 Mich 190, 194; 224 NW2d 255 (1974). In order to ascertain this frame of reference, the contested provisions must be read in relation to the statute as a whole and work in mutual agreement. In re Certified Question, 433 Mich at 722. See also State Treasurer v Wilson, 423 Mich 138, 144; 377 NW2d 703 (1985).
Additionally, the frame of reference shares a deep nexus with the intent of the Legislature. “The primary goal of statutory interpretation is to give effect to the intent of the Legislature.” Title Office, Inc v Van Buren Co Treasurer, 469 Mich 516, 519; 676 NW2d 207 (2004), quoting In re MCI Telecom Complaint, 460 Mich 396, 411; 596 NW2d 164 (1999). Fundamentally, “[t]his task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of [the Legislature’s] intent. . . .” Sun Valley, 460 Mich at 236 (citation and quotation marks omitted). This Court must “consider both the plain meaning of the critical word or phrase as well as ‘its placement and *446 purpose in the statutory scheme.’ ” Id. at 237, quoting Bailey v United States, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). “As far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.” Sun Valley, 460 Mich at 237.
In interpreting § 3104, this Court first must determine how § 3104(2) corresponds with § 3107 and how these two provisions correspond within the scheme of the entire statute. Section 3104(2) requires that the MCCA “shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence .... ”[9] Section 3107(l)(a) defines “personal protection insurance benefits” as “[allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person’s care, recovery or rehabilitation.” This provision requires that all PIP benefits claimed and paid between the insurer and the insured must be reasonable. The MCCA argues that this Court should incorporate the § 3107 definition of “benefits” into § 3104(2) where § 3104(2) refers to “coverages.” However, I would decline to do so because the phrase “personal protection insurance benefits” has a distinct meaning from the phrase “personal protection insurance coverages” that is found in § 3104(2).
When the Legislature uses different words, the words are generally intended to connote different meanings. *447 Simply put, “the use of different terms within similar statutes generally implies that different meanings were intended.” 2A Singer & Singer, Sutherland Statutory Construction (7th ed), § 46:6, p 252. If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word. This construction rule is the corollary to the rule that “words used in one place in a statute have the same meaning in every other place in the statute.” Little Caesar Enterprises v Dep’t of Treasury, 226 Mich App 624, 630; 575 NW2d 562 (1997). Therefore, I disagree with the MCCA and would hold that the definition of personal protection insurance benefits found in § 3107(1)(a) (including the reasonableness standard) is not equivalent to the definition of personal protection insurance coverages in § 3104(2).
The distinctive use of the term “coverages” is important. LeBlanc v State Farm Mut Auto Ins Co, 410 Mich 173, 204; 301 NW2d 775 (1981) (“ ‘Coverage’, a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance.”). Although the terms “benefits” and “coverages” are related because of their close proximity in the statute,[10] the proximity of these two terms does not mean that they are synonymous.
*448 Section 3107 excludes from the definition of “allowable expenses” within PIP “coverages” hospital charges in excess of reasonable and customary semi-private room charges and funeral and burial expenses in amounts specified in the policy (subject to a range specified in that section). This leaves all other charges open to PIP “coverage.” The fact that the Legislature limited the exceptions to “coverage” so narrowly indicates that the term “coverage” is a broader term than “benefits.” Moreover, since “coverages” is never given a more restrictive definition elsewhere in the statute, the word must be afforded its ordinary everyday meaning. Sun Valley, 460 Mich at 237 (“The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.”). In the grammatical context, the meaning of “coverages” is its common meaning, limited only by the specific statutory exceptions.
“Coverage” is defined in dictionaries as the “[ejxtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities,”[11] as “protection against a risk or risks specified in an insurance policy,”[12] as “the risks within the scope of an insurance policy,”[13] and as the “amount and extent of risk covered by insurer.”[14] Under the common meaning of “coverage,” the contractual liability amount that an insurer agrees to pay an insured is considered a part of the insurer’s coverage.[15] USF&G and Hartford paid *449 funds pursuant to a consent judgment and a settlement *450 agreement with the respective insureds. This contractual liability, or coverage, owed by each insurer is the total amount agreed to between the original contracting parties. The reasonableness of the agreed payment amount is not a factor.
The meaning of “coverages” in MCL 500.3107 becomes clearer after considering “ ‘its placement and purpose in the statutory scheme.’ ” Sun Valley, 460 Mich at 236, quoting Bailey, 516 US at 145. In the statute, “coverages” is positioned just after “ultimate loss.” “Ultimate loss” is statutorily defined as the “actual loss amounts that a member is obligated to pay and that are paid or payable by the member ... .” MCL § 3104(25)(c) (emphasis added). The obligation of the insurer is to fulfill its duty by honoring its contractual coverages. The duty to perform the contract relates back to the ultimate loss insofar as the ultimate loss includes payment of the obligation, i.e., the total contracted amount. Consequently, the MCCA must reimburse the insurers for 100 percent of the ultimate loss, which reflects the amount agreed between the insurer and the insured, and subject to PIP coverage. The ultimate loss specifically refers to coverage, which is broader than benefits and is not statutorily limited to reasonable payments.[16]
*451 Moreover, the MCCA is not a no-fault insurer of its member companies and the member companies are not injured persons entitled to no-fault indemnification. Thus, the relationship between the MCCA and its members is not subject to the reasonableness requirements found in MCL 500.3107. Rather, the Legislature provided in § 3104(2) that the MCCA would “indemnify” the insuring members for PIP payments. The Legislature did not state that the MCCA would “insure” or “reinsure” the members for amounts greater than the threshold. Black’s Law Dictionary (5th ed) defines “indemnify” as “[t]o restore the victim of a loss, in whole or in part, by payment. . .; to secure against loss or damage. .. .” Indemnification is not a contingent plan like an insurance plan. Instead, it is a set security meant to assist against certain circumstances. Here, those circumstances arise when the PIP amount contracted by the insurer exceeds the statutory threshold.
Section 3401(1) states that the MCCA is “not subject to any laws.. . with respect to insurers.” Thus, the MCCA is not a no-fault insurance agency, and consequently it is not a reinsurance agency either. Because the MCCA is not a no-fault insurer, but, rather, an indemnitor of no-fault insurers for benefits in excess of the statutory threshold, § 3107 does not directly bind the MCCA; it only binds the insurance members and the insured. Section 3107 “makes both reasonableness and necessity explicit and necessary elements of a claimant’s [insured’s] recovery. . ..” Nasser v Auto Club Ins Ass’n, 435 Mich 33, 49; 457 NW2d 637 (1990) (emphasis added). Specifically, it is the insurance company that has the right to deny a claim (or part of a *452 claim) for unreasonableness under § 3107. The insured then has the burden to prove that the charges are in fact reasonable. See generally Nasser, 435 Mich 33, Manley v Detroit Automobile Inter-Ins Exch, 425 Mich 140; 388 NW2d 216 (1986), and LaMothe v Auto Club Ins Ass’n, 214 Mich App 577; 543 NW2d 42 (1995). Given that the established burden of proof is on the insured, it is counterintuitive to conclude that the member insurance company would benefit from not having the burden of proof in one instance against an insured, but having the burden in another instance against the MCCA.
The MCCA maintains that the foregoing statutory constructions will lead to higher costs to the insured and will be a disincentive for member insurers to keep payments reasonable. These fears are unfounded. The MCCA is an unincorporated nonprofit association, whose purpose is to provide insurers with indemnification for PIP policies that exceed a certain threshold. See MCL 500.3104(1). The Legislature created the MCCA “in response to concerns that Michigan’s no-fault law provision for unlimited [PIP] benefits placed too great a burden on insurers, particularly small insurers, in the event of ‘catastrophic’ injury claims.” In re Certified Question, 433 Mich at 714. The MCCA maintains that it should have the ability to unilaterally stop making indemnification payments to a member when it determines that the claim payments are unreasonable. Yet, the MCCA acknowledges that a member can take the MCCA to court over a reasonableness dispute, which would leave a finder of fact as the ultimate authority over whether the payments are reasonable.[17]
*453 In essence, under the MCCA’s preferred outcome, when a member insurer makes an agreement with an insured (often in a court setting, whether it be an arbitration hearing, consent judgment, or declaratory judgment), the member must then sue the MCCA if the MCCA finds that the payment is unreasonable. If this Court were to accept the MCCA’s argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. The member insurer could then force a jury trial with every catastrophically injured claimant under this benefit in order to secure a verdict with a “reasonable” stamp on the result. This outcome goes against the legislative purpose of assuring efficient and quick recovery for claimants in the no-fault system. Shavers v Attorney General, 402 Mich 554, 578-579; 267 NW2d 72 (1978) (“The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses.”).
In response to the MCCA’s concerns, it should be pointed out that the MCCA is not without a safeguard to protect against unreasonable payments. The Legislature specifically laid out powers that the MCCA could exercise to guard against the possibility that an insurer might take inadequate steps to obtain a review and reasonable settlement of catastrophic claims. MCL 500.3104(7)(b) states that the MCCA shall:
Establish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the *454 purpose of reporting claims, the member shall in all instances consider itself legally liable for the injuries or damages. The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim. [Emphasis added.][18]
This statutory language establishes that the MCCA must create a structure whereby members are bound and liable to the MCCA to deliver paperwork regarding potential claims that would exceed the threshold and consequently affect the MCCA. The MCCA’s plan of operation likewise echoes these statutory requirements.[19] Specifically, this language requires that the MCCA’s safety check over the member’s claim must occur upon the member’s anticipation that the payment will affect the MCCA, or if the agreement has already been made, when circumstances change and the member believes the payment to the insured will soon affect the MCCA.
It is only at these times, not after, that the MCCA can take action regarding the claim. MCL 500.3104(7)(g). Accordingly, the MCCA must respond in accordance with § 3104(7)(g). Under § 3104(7)(g), the MCCA must
[e]stablish procedures for reviewing claims procedures and practices of members of the association. If the claims procedures or practices of a member are considered inad *455 equate to properly service the liabilities of the association, the association may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member. [Emphasis added.]
More clearly, when § 3104(7) (g) is read in conjunction with § 3104(7)(b), the outcome is that the MCCA is required to review those reports by members that anticipate needing indemnification and to assess the adequacy of the procedures or practices of the member.[20] Upon a finding of inadequacy, the MCCA can adjust the practices or procedures of the member.[21] One of the key protections here is that MCCA has the power and duty to adjust only “procedures and practices” of the member that produce an unreasonable payment amount; the *456 power does not include the power to adjust the amount.[22] The MCCA has the power to adjust situations that it anticipates will compromise its indemnification or will require it to pay unreasonable claims only if it can find fault with the member’s methods or calculation of charges. Furthermore, the MCCA has the power, in adjusting the procedures and practices of member insurers, to require member insurers to inform the MCCA of any claim that could foreseeably exceed the statutory threshold and to afford the MCCA the opportunity to object to proposed settlement agreements regarding those claims. By requiring submission of proposed settlement agreements for the MCCA approval, the MCCA could protect against having to later pay unreasonable claims from member insurers. The exercise of these powers is the MCCA’s safeguard from a member’s neglect of its duties.
Finally, the MCCA argues that § 3104(8)(g) gives it the power to question reasonableness regardless of the statute’s other provisions. Specifically, § 3104(8)(g) allows the MCCA to “[p]erform other acts not specifically enumerated in this section that are necessary or proper *457 to accomplish the purposes of the association and that are not inconsistent with this section or the plan of operation.” However, this section does not give the MCCA carte blanche to simply avoid whichever member insurer’s agreement that it finds unreasonable. The power granted under § 3104(8)(g) is limited to accomplishing the “purposes of the association.” More importantly, the exercise of this power cannot be “inconsistent with this section or the plan of operation.” Id. The plan of operation, created by § 3104(17), must be “consistent with the objectives and provisions of this section, which shall provide for the economical, fair, and nondiscriminatory administration of the association and for the prompt and efficient provision of indemnity.” MCL 500.3104(17) (emphasis added).
Section 3104(8)(g) allows the MCCA to fulfill the specific requirements of the statute. Accordingly, I would interpret § 3104(8)(g) as granting the MCCA the limited power to further its purpose of prompt and efficient indemnification to its members. To interpret that section as granting any further power, such as the power to decline indemnification on the basis of the reasonableness of the indemnification amount, would be inconsistent with the intention of the Legislature.
IV CONCLUSION
I would hold that the indemnification obligation set forth in § 3104(2) does not incorporate the reasonableness standard that § 3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the “practices and procedures” of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers.
*458 Finally, I would hold that the power granted to the MCCA under § 3104(8) (g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes.
Accordingly, I dissent and would affirm the Court of Appeals holding that the MCCA must reimburse its member insurers 100 percent of the ultimate loss exceeding the statutory threshold for claims regardless of the reasonableness of the amount.
CAVANAGH and KELLY, JJ., concurred with WEAVER, J.

 Mr. Migdal created a company to manage Daniel’s care. This company acted as an intermediary using the benefit payments from USF&G to pay the hired nurses that cared for Daniel and to pay Mr. Migdal for his efforts in Daniel’s care. The judgment contained the caveat that if Daniel’s condition substantially changed, the court retained jurisdiction and could determine whether a reduction or increase in the payments was “warranted.”

 Mr. Migdal testified that his duties included reading papers concerning business management and medical advances, checking and providing maintenance of Daniel’s equipment, keeping the books, paying the nurses, and shopping for necessary items for Daniel’s care.

 MCL 500.3104(2) reads, in pertinent part:
[T]he association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence ....
At the time of both accidents involved in these consolidated appeals, the threshold amount was $250,000.

 Mr. Migdal paid $32 an hour of this amount to the nurses (including benefits), and Mr. Migdal kept the rest as compensation for his work.

 USF&G did not appeal this decision. I therefore express no opinion on whether the consent judgment would have been subject to judicial modification on the ground that the payment amount it called for had become unreasonable with the passage of time.

 MCL 500.3104(2).

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 274 Mich App 184, 192; 731 NW2d 481 (2007).

 481 Mich 862 (2008).

 The amounts are statutorily set to increase over time. At the time of both accidents, the threshold amount was $250,000. In 2008, the threshold amount was $440,000. See MCL 500.3104(2)(a)-(k).

 MCL 500.3107(1) provides, in pertinent part:
Except as provided in subsection (2), personal protection insurance benefits are payable for the following:
(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person’s care, recovery, or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations... or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00. (Emphasis added.)

 Webster’s II New College Dictionary (1995).

 Random House Webster’s Dictionary (2001).

 Black’s Law Dictionary (7th ed).

 Black’s Law Dictionary (5th ed).

 I agree with the majority insofar as it concludes that the MCCA was required to indemnify the insurer for (1) the ultimate loss; (2) sustained under personal protection insurance coverages; and (3) in excess of the *449 statutory threshold. However, the majority erroneously limits the term “coverages” by incorporating into its definition the reasonableness requirement for “benefits” found in § 3107. However, as the various definitions of “coverage” reveal, “coverages” is not such a specific term that it can be limited to the amount of “benefits” payable under a policy. Rather, “coverages” is a broad term that applies to different categories of risks. Hence, the Legislature used “benefits” and “coverages” as distinct terms with distinct meanings. By incorporating the reasonableness requirement of “benefits” into “coverages,” the majority blurs the meaning of the terms and ignores the broad common meaning of “coverages.”
The majority opinion relies significantly on language from In re Certified Question that limits the indemnification requirement of § 3104(2) to “a policy which was written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the ‘owner or registrant of a motor vehicle required to be registered in this state.’ ” In re Certified Question, 433 Mich at 723. The majority seizes on this language as “implicitly” holding that the MCCA may review claims to determine whether members are entitled to indemnification.
The majority’s reliance on In re Certified Question in this case is flawed. First, it notes that the In re Certified Question Court allowed the MCCA to determine whether the insured was a “resident” of the state. Once the residency question was resolved, the Court determined that the MCCA was not required to indemnify the insurer because § 3104(2) does not apply to PIP payments to nonresidents. Therefore, the benefits at issue in In re Certified Question were paid pursuant to the requirements of § 3163 of the no-fault act, not § 3101. By contrast, the policies at issue here clearly were written to provide the security required by § 3101. In re Certified Question at most only gave the MCCA the authority to reject indemnification for benefits paid to nonresidents under § 3163. Thus, to the extent that the majority opinion relies on In re Certified Question as determinative here, it errs. The majority goes too far by endorsing an extension of the holding of In re Certified Question to allow the MCCA to resolve any question about whether § 3104(2) applies.
Further, in In re Certified Question, once the residency question was answered, it was objectively clear from the statutory language that § 3104(2) did not apply. In contrast, in this case the majority extends the reasoning of In re Certified Question to allow the MCCA to make subjective “reasonableness” determinations about the insurer’s payment of PIP benefits. Yet nothing in the statutory scheme explicitly gives the MCCA the authority to make such a determination. The majority claims that “[cjoncomitant with the absence of an obligation to indemnify is the authorify to act accordingly and reject claims that do not meet the *450 requirements of § 3104(2).” Ante at 427.1 disagree. Again, In re Certified Question only relieved the MCCA of its obligation to indemnify benefits paid under § 3163. In re Certified Question did not, explicitly or implicitly, grant the MCCA additional authority beyond the authority granted to it by the plain language of the statute.

 The MCCA argues that if there is not a reasonableness factor for them to enforce, then the member insurers will have no incentive to make reasonable settlement deals that do not exceed the statutory threshold amount because the insurers will not be liable to pay anything beyond the threshold amount. However, one incentive comes from higher premiums paid to the MCCA. See MCL 500.3104(7)(d) (requiring that the *451 MCCA assess its member companies an annual premium on each of their no-fault policies written in Michigan). If all the individual members act in a manner that does not regard the reasonableness of their settlements, then insurance premiums will increase greatly.

 Presumably, under the statute, the costs of this trial would be covered or charged to the member insurer. See MCL 500.3104(7)(g) (the MCCA “may charge the cost of adjustment to the member” that the *453 MCCA deems to have inadequate practices or procedures); MCL 500.3104(7)(b) (“Solely for the purpose of reporting claims, the member shall in all instances consider itself legally liable for the injuries or damages.”).

 Section 3104 includes numerous other rules for the MCCA, such as membership requirements, liability, and creation of a “plan of operation.”

 Art X, § 10.01 of the plan of operation provides in part:
Members shall report to the Association such information as the Board may require on forms prescribed by the Board: (a) As soon as practicable after the loss occurrence, Members shall report each claim which, on the basis of the injuries or damages sustained, may reasonably be anticipated to result in a Reimbursable Ultimate Loss, and for purposes of reporting the Member shall consider itself legally liable for the injuries and damages.

 The MCCA argued that since part of § 3104(7)(g) uses the term “may” instead of “must” in describing some of its potential powers, the MCCA has greater power than what directly follows in the statute to limit or control the individual member insurers. The MCCA wishes to conclude that since the section does not set forth a duty to act in a specific way (e.g., review claims), it allows the MCCA to act how it wants regarding member claims, including questioning their reasonableness. This is erroneous. The starting general presumption and purpose of the MCCA is to indemnify insurers for payments beyond the threshold amount, so that smaller insurance firms can continue to exist in the no-fault world of Michigan.

 The plan of operation also echoes the statute in this regard:
If a Member or 3103 Member refuses to timely submit the reports or information required of it pursuant to Section 10.01 or otherwise, or if the Board should determine that the reports and information submitted by a Member or 3103 Member are unreliable or incomplete, the Board may, at the member’s expense, direct that an authorized representative of the Association (which may be another member) shall audit and inspect such member’s records and compile the required information and data. [Art X, § 10.02.]

 Although § 3104(7)(g) states that the MCCA may “adjust or assist in the adjustment of claims,” the practical effect of § 3104(7)(g) is that only the MCCA is able to adjust a member insurer’s procedures and practices with regard to the reasonableness of the amounts paid to insureds. When the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the member insurer. The claim that the MCCA reviews for adjustment purposes is the claim made by the insured to the member insurer, not the reimbursement claim made by the member insurer to the MCCA. Thus, the MCCA, standing in the shoes of the member insurer, is limited to the member insurer’s power to review the insured’s claim for reasonableness as spelled out in the member insurer’s policy, a settlement agreement, or a consent judgment. With regard to the reasonableness of the amount paid to the insured, the amount is still dictated by the amount that the member insurer is “obligated” to pay to the insured.